Steven J. GLUSBAND, As Receiver for Morgan, Harris & Scott, Ltd., Harrison Prescott, Inc., and Euro American Currency Corporation, Plaintiffs,

v.

EURO–SWISS INTERNATIONAL CORPORATION, Trimble, Coven & Goldman, P.C., Bernard J. Coven, Henry W. Trimble, Jr., and Morris Goldman, Defendants.

No. 79 CIV. 5955 (CBM).

United States District Court, S. D. New York.

Nov. 30, 1979.

Sage, Gray, Todd & Sims by Robert W. Brundige, Jr., New York City, for plaintiffs.

Bernard J. Coven, New York City, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

This is an action brought by Steven J. Glusband, plaintiff, as Receiver for Morgan, Harris & Scott, Ltd. (MHS), Harrison Prescott, Inc. (HP), and Euro American Currency Corporation (EAC) against Euro-Swiss International Corporation (Euro-Swiss), Trimble, Coven & Goldman, P.C., Bernard J. Coven, Henry W. Trimble, Jr. and Morris Goldman, defendants. On November 2, 1979 this court on the application of plaintiff granted an order attaching the assets of Euro-Swiss on the ground that Euro-Swiss, in an attempt to defraud its creditors and frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, had disposed of and was about to dispose of and had secreted and was about to secret its property.

The ex parte application for the attachment was supported by the affidavit of Glusband and a verified complaint. The matter is now before the court on the motion of the Receiver to confirm the attachment, N.Y.C.P.L.R. § 6211(b) and the motion of defendants to vacate the attachment. N.Y.C.P.L.R. § 6223.

After a hearing, the motion to confirm the attachment is granted and the motion to vacate the attachment is denied. Defendants are also enjoined from transfer-

ring, disposing of, secreting, encumbering, assigning or dissipating any and all of the assets of Euro-Swiss and its subsidiaries pending further order of this court. ·

Steven J. Glusband was appointed by the undersigned as Receiver of MHS, HP and EAC in an action presently pending in this court entitled *Commodity Futures Trading Commission v. Morgan, Harris and Scott, Ltd., et al.,* 484 F.Supp. 669 (D.C.) 79 Civ. 4313. The Receiver brings this action pursuant to 28 U.S.C. § 754, invoking the ancillary jurisdiction of this court.

Defendant Euro-Swiss is a New York corporation with its principal place of business in New York, New York. It is engaged in the business of selling deferred delivery contracts for precious metals and foreign currency. MHS, HP, and EAC are all corporations originated and existing under the laws of New York with principal places of business in New York. They were likewise engaged in the business of buying and selling to the public deferred delivery contracts for precious metals and foreign currency. James O'Conner is the president and chief operating officer of Euro-Swiss. Defendant Bernard J. Coven is the secretary of Euro-Swiss as well as the attorney for Euro-Swiss through his law firm, Trimble, Coven & Goldman, which was a defendant in this action. Coven also acted until May, 1979, as counsel to MHS and HP. All defendants maintained offices in New York City.

From their inception through August 3, 1979, MHS and HP engaged in the business of selling to the public deferred delivery contracts for precious metals. Under these contracts the public customers would pay a fee to MHS or HP in exchange for the right to take delivery of an agreed quantity of metal or currency at a fixed date in the future upon payment of the price at which the metal or currency was selling at the time the contract was entered into. If the market price of the metal or currency at maturity was higher than the purchase price, the customer had the right, instead of taking delivery, to receive a sum equal to the difference between the purchase price and the market price at maturity, times the agreed quantity, referred to as the equity.

Beginning about February 1979 MHS and HP entered into contracts with Euro-Swiss to purchase the same quantity of metal or currency at the same purchase price at the same fixed date in the future covering 86 contracts which MHS had with the public and approximately 113 of these contracts which HP had with the public. Euro-Swiss knew that MHS and HP had identical contracts with members of the public which MHS and HP covered by their contracts with Euro-Swiss. Contrary to the testimony of Coven, in no case in which settlement was made by Euro-Swiss upon maturity of these contracts did MHS or HP take actual delivery of the metal or currency. Instead in each case Euro-Swiss paid MHS or HP the equity due on these contracts. Euro-Swiss never required the taking of actual delivery of the metal or currency by MHS or HP. No settlement has been made by Euro-Swiss to MHS or HP by Euro-Swiss with respect to any contracts entered into between them which matured subsequently to August 14, 1979.

The evidence discloses that with respect to these contracts which matured prior to November 1, 1979 the equity due by Euro-Swiss on these contracts to MHS and HP was approximately $2,480,000. Defendants asserted on the hearing through the testimony, particularly of Mr. Coven, that contracts entered into between Euro-Swiss and MHS and HP on August 3, 1979 required MHS and HP to actually take delivery of the metal or currency by paying the purchase price for same at maturity of each contract and then, five (5) days later, Euro-Swiss would deliver the metal or currency involved to MHS or HP.

The court finds that the contracts on which defendants relied to sustain this assertion were not executed until October 17, 1979 and were backdated to make it appear that they were executed on August 3, 1979 to become effective at an even earlier date. These contracts on which the defendants relied were executed by Earl Wilt, former president of MHS and HP on behalf of

MHS and HP at a time when he had no longer the authority to do so, this court having appointed Glusband on September 28, 1979.

The court therefore finds that MHS and HP were not required to take actual delivery of contracts maturing after August 14, 1979 and before November 1, 1979 and that the amount due on these contracts is approximately $2,480,000.

The court also finds that Euro-Swiss doctored its books and records to reflect the existence of two contracts which it alleges were purchased by HP on July 30, 1979 for the purchase of 10 million Mexican pesos. Euro-Swiss claims that service fees of $80,000 are owed to it by HP with respect to these two contracts. The court finds that there were no such contracts and that $80,000 for service fees on these contracts are not due and owing by HP to Euro-Swiss.

The court further finds that the claim for $80,000 in service fees is a result of a scheme to defraud initiated by Coven with Earl Wilt and that in this connection Euro-Swiss offered a cash bribe to Wilt in an attempt to get him to represent to Glusband, the Receiver, that the two contracts for Mexican pesos actually existed.

The court also finds that as part of a scheme to defraud, Coven requested Wilt to represent to the Receiver that the two customer agreements signed by him on behalf of MHS and HP providing for actual delivery of the metal or currency were, in fact, executed on August 3, 1979.

The court further finds that Euro-Swiss has defaulted on similar contracts entered into with other of its customers. The officers and principals of Euro-Swiss, the evidence discloses, are planning to discontinue their business of selling deferred delivery contracts for precious metals and currency and will instead conduct business through Hobart Security which Euro-Swiss recently acquired.

Finally, the evidence discloses that the principals of Euro-Swiss are probably planning to transfer assets outside of New York and are intending to set up a bank in the Bahamas.

The Receiver has met his burden of establishing on this motion that he would probably succeed on the merits of his action against Euro-Swiss, that Euro-Swiss had intentionally attempted to defraud MHS and HP, the Receiver, as well as this court, has attempted to frustrate the enforcement of a judgment that is likely to be rendered in the instant case in favor of plaintiff, and has secreted some of its property and is planning to secret and move other property.

The court finds that it is absolutely necessary that the levy on the order of attachment be continued, that the attachment order of November 2, 1979 be confirmed, and the motion of defendants to vacate be denied.

The court also finds it necessary to enjoin defendants from transferring, disposing of, secreting, encumbering, assigning, or dissipating, any and all of the property and assets of Euro-Swiss and its subsidiaries.